I would note that you will see that two of our members are not here this morning. I assure you that they will review the video and audio tapes of this hearing this morning and will participate fully in the decision in this case. With that then we begin with agenda number six, In Re John O. Cutright Disciplinary Commission. Council may proceed when they're ready. Good morning. May it please the court. My name is Stephen Split and I represent the administrator of the Attorney Registration and Disciplinary Commission. In this proceeding, we ask this court today to reverse a finding of no dishonesty by the hearing and review boards below in connection with respondent John Cutright's improper gifts to then sitting Judge Robert Kokenor and also to reject the review boards recommendation of a sanction of a six month suspension in this case and instead suspend the respondent from the practice of law for two years. This complaint arose or this action arose out of a three count complaint. The first count concerned respondents conflict of interest as to a client of his, an elderly woman named Martha Hayden. He had created a document by which she forgave a $312,000 loan when the forgiveness benefited another client of respondents and he was found to have engaged in a conflict of interest and a breach of fiduciary duty in that count. The second count concerned respondents gifts to then Judge Robert Kokenor. He had reviewed the judge's tax returns and tax returns for affiliated businesses without charge to the judge for five years and he was found to have given improper gifts to Judge Kokenor in violation of rule of professional conduct 3.5 H and the administrator alleged that he also engaged in dishonesty in connection with his failure to tell opposing counsel about his relationship with the judge. The third count of the complaint concerned respondents neglect of Bessie Carpenter's estate. It was a probate estate. Respondent opened the estate in 1986 and didn't close it until 2006. There was a time of about 16 years at one point where the respondent did nothing. He was found to have neglected that estate and failed to keep the heirs reasonably informed about the matter and failed to explain things about the case to the extent that would allow them to make informed decisions about the representation. The hearing board found that misconduct and it be suspended from the practice of law for 120 days and that he also complete the program offered by the Illinois Professional Responsibility Institute. The administrator took exceptions to the review board in that case on the no dishonesty finding and also on the sanction. The review board found a breach of fiduciary duty in connection with count one and upped the recommended sanction to six months. At that point, at the point of the oral argument and the review board, the respondent had already completed the Illinois Professional Responsibility Institute's program, so there was no recommendation about that. Now, with regard to the no dishonesty finding, the pertinent facts about that count are this. Judge Kokanor was on the bench at Circuit Court in Cumberland County from 1990 to about 2002. After that point, he was convicted and imprisoned for stealing $2.2 million from the estate of a local man named Jay Hayden, who was the son of Martha Hayden, who was the woman in connection with count one. About 1995, the Kokanor family's accountant came to respondent and wanted him to become the paid preparer for the Kokanor's income taxes because in that man's words, he was tired of wrangling with the IRS, and he didn't want to hear anything else about the Kokanor's income taxes. So respondent agreed that he would become the paid preparer for the Kokanor family's income taxes and their affiliated businesses. And he did. Between 1996 and 2000, the respondent acted as paid preparer. He reviewed and either signed returns or had his secretary sign returns, 20 returns between 1996 and 2000. Five of those returns were personal income tax returns for Judge Kokanor and his wife. Four were   to the no dishonesty finding, the pertinent facts about that count are this. One was the estate of Jay Hayden, because Judge Kokanor was acting as the executor of the estate at that time. And 11 returns were business returns for Kokanor affiliated businesses like Triple C Thoroughbred and Triple C Thoroughstock and businesses like that. During this time, respondent was regularly appearing before Judge Kokanor. He had a practice in Greenup, Illinois, that was at least in part litigation based, and he was also the    first person to appear before Judge Kokanor. In respondent's answer to the administrator's complaint, he admitted that between 1990 and 2001, he had appeared before Judge Kokanor hundreds of times. He was never paid for his work on the tax returns, and he never in any case told opposing counsel that he had this ongoing tax review relationship with the judge. As I said, the hearing board found and the review board agreed that respondent had given   ongoing tax review relationship with the judge. As I said, the hearing board found that while respondent should have disclosed that he was reviewing the returns, and in the hearing board's words, the appearance of impropriety was blatant, the hearing board said that it didn't believe that respondent acted with any intent to deceive. And what the hearing board said was that it was quote, likely that the respondent was simply abusing his power. The    disclosed that he was reviewing the returns, and in the hearing board's words, the respondent was simply oblivious about his ethical obligations and the existence or appearance of any impropriety. This is where the administrator takes issue with the hearing board's finding. In the administrator's view, it's against the manifest weight of the evidence for the hearing board to have made that decision. In the administrator's view, since rule 8.484, which prohibits conduct involving dishonesty, fraud, deceit, or   the hearing board to have made that decision. In the administrator's view, the hearing board's finding is a different one. In the administrator's view, it's based on, based on recklessness by the attorney. The administrator submits that the evidence clearly showed that respondent was at least reckless as to his actions before the judge. Respondent admitted that he knew that the attorneys, that the returns were coming through his office and that he was acting as, that he was reviewing them. He admitted that he knew that he wasn't being paid, and he actually stated at one point during the  hearing that he was not being paid, and that he would not be doing that judge's income tax returns. So respondent, by his own admission, knew what he was doing and knew what he was doing was wrong. And yet... Mr. Splint, would the Witt case stand for the proposition that intent to deceive was necessary and recklessness isn't enough? Well, the Witt case relied on some of the common law fraud causes of action. And the Witt case does say that an intent to deceive is, is required, but we believe that cases since that time have, have kind of stepped away from that very specific common law linking. Cases like Yamaguchi, Al Shuler have, have described fraud much more broadly than fraud was described in Witt. And also this, this court has approved and confirmed cases like Goldberg and Jakubowski in which the review board specifically stated that recklessness was sufficient to, to establish a violation of Rule 8.484. How, how do you address the respondent's argument that if recklessness would be enough rather than intent, that that is going to create too much of a gray area and difficult to decipher where intent would be a clearer standard? Well, I, I, I think the respondent has nothing, has no proof that that would be a concern. If you, if you look at negligence, for example, or, or neglect, certainly there's a spectrum of neglect as there's, as there's a spectrum in almost any kind of misconduct. An attorney can neglect a case by simply losing track of it. And, and yet he will have been found to have neglected the case and it will be on the scale of how bad neglect can be, it will be more on the scale of how bad neglect can be. And so the respondent can pick up a case and, and purposely make a decision or, or intend to neglect that case in order to damage that client. And that is a much more egregious type of neglect than is the former example. And yet they're both neglect. And, and the administrator, the hearing boards, the review boards have no problem with differentiating between finding the misconduct and then weighing the egregious or benign nature of that misconduct for sanction purposes. And we believe the same kind of thing would be done in, with regard to 8.484. One can, one can be dishonest, we believe, in, or be reckless with regard to, for example, writing checks on your trust account without really ever opening your, your, your bank statements. So that you don't know whether when you're paying one client, you're paying that client with another client's funds. And, and that, in our view, is dishonest based on a recklessness standard. But it's certainly not as bad as an attorney who, who takes funds purposely with an intent to cheat a client and run off to Belize or something. So we believe that the administrator and, and the hearing and review boards regularly deal with kind of a scale of egregiousness with regard to misconduct. And that what we're advocating here with a recklessness standard is really nothing different than happens with, with regard to a lot of disciplinary violations. In the administrator's view, there was a recklessness here with regard to respondent's duty to his opposing counsel. As I was, as I said, he admitted that he knew what he was doing was not proper. And, and this is not, what, what's important for this court to, to recognize is that this is not kind of an isolated incident. This wasn't one tax return and then four months later you appear before the judge. This was 20 returns over a five-year period in a situation where the respondent had agreed to run interference for the Coconores with the IRS if that was, was going to come up. And this was a, a routine, almost constant appearance before this judge. At some point it, it would dawn on any attorney, much more so a litigator and much more so a public defender, that, that respondent's silence about his relationship with the judge fostered a deception. And that deception we, we submit would have been absolutely appreciable by any attorney. So we believe that there was really no evidence upon which the hearing board should have made a decision that it likely didn't dawn on respondent that he would have to speak up to opposing counsel in order to not cause a deception to occur. And under this recklessness standard, we believe that the hearing board's finding that there was no 8.4A4 violation is against the manifest weight of the evidence. But even if this court rejects that, that argument, the administrator submits that there should be no requirement of an intent to deceive under Rule 8.4A4 with regard to that rule's prohibition against dishonesty. I pointed out in, in my brief that the rule obviously is stated in the disjunctive. It prohibits conduct involving dishonesty, fraud, deceit, or misrepresentation. Under precedent from this court and the, and the Illinois Appellate Court, when words in a statute or rule are stated in the disjunctive, they're supposed to have different meanings. The ABA in its, in its model rules, the same four words are used in the disjunctive in the ABA model rules. And the ABA has said that the, that the disjunctive should not be used in the disjunctive. Now, this court has defined fraud in a number of cases and, and defined it broadly, but it has never spoken to two things. It has never spoken to the fact that these words are in, are stated in the disjunctive. And it has never defined any of the other three terms in Rule 8.4A4. And we submit that those terms should be defined differently so that they don't all just encompass the same type of, of misconduct. In a case that was, that was approved and confirmed by this court, the Wheaton case, the review board found dishonesty in connection with an attorney's statements, even though that attorney did not intend to deceive. And review board member, Thomas Zimmerman, in that case, wrote a specially concurring opinion that advocated that these terms be specifically recognized as encompassing related but different misconduct. And we would ask this court to, to, in this opinion, to define the parameters of Rule 8.4A4. Thomas Zimmerman relied in large part on a case out of the District of Columbia, an attorney disciplinary case called In Re Shorter. And the Shorter case was one in which the dis, the district court there or the D.C. court was construing its own rule, which like 8.4A4, described or prohibited conduct involving dishonesty, fraud, deceit or misrepresentation. And what the court said was that dishonesty was the, the most general term out of the four. It encompassed fraud, but it also encompassed conduct that just evinced a lack of honesty or was, evinced a lack of straightforwardness or fairness. Fraud, according to the Shorter court, was all means by which one gains an advantage over another by, by virtue of dishonesty. Deceit was the suppression of facts or misleading another with false facts. And misrepresentation was the untrue representation of facts. The administrator believes that, that these, these definitions are workable and logical for Rule 8.4A4. And if this court would, would subscribe to them, then, then respondent's conduct here would be dishonest. Respondent's failure to say anything at any time to any of the opposing counsel that he was appearing with before Judge Kokanor while he was, had this relationship with Judge Kokanor at its core was, was dishonest conduct. And we believe that if 8.4A4 is, is given the, the interpretation that it would seem to, to deserve, that respondent's conduct should be found to be dishonest without any intent to deceive. With regard to the sanction in this case, the review board recommended a suspension of six months. The administrator before the hearing board rec, or advocated for a two year suspension, before the review board advocated for a two year suspension, and we continue to advocate for that before this court. If you look at the totality of the respondent's misconduct, you have the conflict of interest with regard to Martha Hayden, which the administrator views as a relatively egregious conflict of interest. As I stated, this was an elderly widow who had made a loan of $312,000 to the Kokanor family, and she came to respondent to have that debt forgiven. And respondent simply said, okay, I'll draw up the documents. And, and he did that, and he did not at all make any inquiries as to Ms. Hayden, as to whether this would be financially disastrous for her, as to, he didn't discuss with her any of the ramifications of her decision to do this, and I think everyone can recognize that this was a substantial amount of money. So you have a conflict of interest there that really deprived, or had the potential to deprive Martha Hayden of, of this money. You have the improper gifts to the judge over the course of five years. You have his dishonesty in connection with his failure to apprise opposing counsel about those gifts. And then you have this neglect of the estate, and usually neglect is, is something that's not necessarily met with a suspension, especially an isolated neglect. But this was a neglect that, as I stated, was in excess of 16 years in length, and it had the, the hearing board found the, the consequences of prejudicing some of the heirs to the estate. A couple of the heirs died during that 16 year period, and then when they finally got their money, they got essentially no interest on that money over the time period. So the administrator believes that if you look at the conflict, you look at the gifts to the judge and the dishonesty, and you look at the neglect, a two year suspension is, is, is about where the precedent would, would determine that you should land. Conflicts, cases like Heldrich and Lipinska, those were nine month, one year cases for single conflicts. Gifts to judges cases, one year generally for, Mr. Lane was suspended for one year for a $2,500 loan to a judge and then compounded by the fact that he appeared once before that judge during the time that loan was unpaid. And then you have the length of the neglect. This should be a case where a two year suspension is appropriate. So we would have. In connection with that, the latter case you discussed, the long delay in this case or anything in the record that would show a benefit to Mr. Cuntright other than the billing for the tax returns that he did over that period of time? No, there's really not. It's more. Simply a neglect. Right. He, he did do the tax returns over those years and he was paid every year. But it was more the damage to the, the heirs more than a benefit to him. So we would ask for a two year suspension. What about the fair market value of those returns? Was that established and placed in the record? For the, for the tax, for the estate returns? I don't believe, I don't, well no, he made 30, he made $3,000 I think over the, yeah, I believe that's what it was. Were the returns, I mean, that he didn't, the judge didn't pay for at all? Oh, oh, those returns. The testimony was that he would have charged between $50 and $100 for reviewing a tax return. So 20 returns at $100 would have been $2,000. 20 returns at $50 would have been $1,000. And earlier you mentioned running interference with the IRS. Did he do any legal work in that capacity? There was, there was no evidence that there was any sort of audit or anything like that during the five year period. Thank you. Thank you, counsel. Counsel, you may proceed, Mr. Moran. Thank you, Mr. Chief Justice. May it please the court, counsel. My name is Bill Moran. I represent the respondent in this cause, Mr. John Cutright, whose name mainly ruled county. Mr. Cutright was licensed to practice in 1967 and therefore has practiced for 42 years without a previous formal disciplinary complaint being filed against him. Respondent would agree that there are some fascinating legal issues that have been raised in this case, especially concerning the applicability of Rule 8.4A4 to this proceeding. But as the issue that he is most interested in is the disciplinary sanction that is going to be entered against him in this case. In this instance, the administrator is requesting a sanction four times as large as what the review board recommended in this case. And therefore, it is a very important issue to Mr. Cutright because he is 67 or 68 years old now. It may be a two year suspension would be the end of his career. Therefore, I'm going to start out in this instance with talking about the discipline that we believe should be imposed in this circumstance. As the court has said numerous times over the years, the purpose of a disciplinary proceeding is not to punish the attorney, but rather to protect the public, to maintain the integrity of the profession, and to safeguard the public. In this case, the review board and respondent in his brief, the administrator in his initial motion to approve and confirm, relied upon the Tuohy case. The Tuohy case involved an aggravated conflict of interest where an attorney who represented a company that was involved with a sand pit had a woman who was his client, she was a widow, she had inherited some money, and he caused her or kind of ushered her to the door of the sand company and she loaned significant amounts of funds to that company without any disclosures by Mr. Tuohy about the risks, risks that he knew because he was the attorney for the company and he knew the company was in bad shape. While the facts in this case are not exactly what we have here, what the court in the Tuohy case looked at was the attorney's intent and found that there were no deliberate misrepresentations made by the attorney, nothing of an affirmative matter, that he didn't have his own self-interest or a profit interest in mind when he invited this client to make these investments. The attorney had been admitted to prison, had good character evidence, and the court said in that case that the purposes of a disciplinary proceeding would be served by a six-month suspension. We believe that the circumstances are very much the same here. In mitigation, as I've said, Mr. Cutright has practiced for 42 years without a previous complaint. He had good character. He had judges testify on his behalf that have known him for many years and he's always enjoyed a good reputation in the community. He served a rural area, which has never been seen as specifically a mitigating factor, but there's testimony in the record that at some times during his career, Mr. Cutright was the only attorney who was involved in private practice in Cumberland County on a full-time basis. There were obviously judges, there were obviously the state's attorney, but there were times when he was the only person that had his shingle out in the whole county. As found by the Hearing Board and Review Board, there was no personal profit motive in anything that he did in this instance. There was no dishonest motive in this case. He cooperated fully with the disciplinary authority. Therefore, in this case, we believe that a six-month suspension would serve the purposes of a disciplinary proceeding. If you look at the three different counts, there is misconduct there. The respondent has admitted that he engaged in misconduct in all three instances, but there are no real aggravating circumstances related to any of these situations. In relation to the count one, conflict of interest, the misconduct in that instance took place in February of 1993. While there is no statute of limitations in disciplinary proceedings, I think the court has to take into consideration that this happened 16 years ago and that we haven't seen a flood of similar conduct from Mr. Cutright in the intervening period of time. The client, Martha Hayden, Mr. Cutright testified was somebody that he knew his entire life. In fact, the testimony shows that he sat in with his father and the Haydens while he was a law student when he interviewed them about their estate and about their initial wills that he prepared for them. His testimony was that when Martha came in and asked that this gift be forgiven, that he thought that was reasonable, that it was her clear direction, and he thought what he was doing was appropriate. Obviously, in this case, there was a conflict of interest. He did represent the Coconauer family through the Clark Coconauer estate, and that should have been disclosed to Martha in this instance. That's where Mr. Cutright made his mistake in this instance, and he will own up to that mistake in this instance. Small kind of a... But that mistake resulted in the loss of some $300,000 by Ms. Hayden. Isn't that correct? It did. And again, though, there's no testimony or evidence at all in the record that shows that Mr. Cutright participated in that, received any benefit from that. There is a suggestion that he failed to advise her as to the consequences of that act, though. Isn't that correct? That's correct, though. His testimony was adhering that he had known Martha her whole life, that she was a business person involved in the local community, and that her direction was clear. He said so clear that she had, at a previous occasion... How old was she at the time of the transfer, or the forgiveness of the loan? 86 or 87, I believe. Is there any explanation at all in the record with respect to the rationale or the reason for the forgiveness of the loan? Mr. Cutright testified at the funeral of Clark Coconauer. Martha was there, and she made a public statement to everybody that she had a debt of gratitude to the Coconauer family for everything that they had done. Robert Coconauer took care of Mrs. Hayden, as we later found out, took care of her in a bad way, because he was stealing from her directly, but he drove her to meetings, he took her places, he looked after her finances. Everybody knew that, and so that in Mr. Cutright's mind linked the two together, and it wasn't just on that one day that she came in and said she wanted to do something for these people, but had earlier, at least six months earlier, expressed the same sentiment at the Clark Coconauer's funeral. Do we know how much the 300 and some thousand was in relation to her estate? Is that in the record? There are indications in the record that Judge Coconauer, in addition to paying himself $24,000 a year for executor's fees, also depleted Martha's personal checking account that started out with something like $70,000 and ended up at $33,000. There was also indications in the record that Judge Coconauer diverted to himself $188,000 inheritance that Martha was entitled to. So her estate, after all of those, or before all of those things, was at least a half a million dollars. So this was more than 60% of the estate, right? It was. And do we know, did he give her any kind of advice on her estate? And did he know the amount of her estate when he prepared this document? He went all the way back to, as I said, 1966, before he was admitted, when he sat in with Mr. and Mrs. Hayden and knew their assets then. He had handled, I believe, the estate of Mr. Hayden when he passed away. Jay Hayden was one of Mr. Cutright's best friends, so he believed that he accurately knew what her estate entailed, had a rough idea, though he did not sit down and look at all the proof. But because of his relationship over the years, even in a legal capacity, he thought he had a good understanding of what the estate was. Were the heirs of Mrs. Hayden known at the time of the forgiveness of the loan, either by, what does the record reveal concerning that? I don't think the record reveals that anybody knew about a lot of these things that happened, quite frankly. Not that this had happened, but that there were heirs, in fact, commonly known about at the time of Mrs. Hayden's action. Well, the Haydens had their one child, Jay, who passed away from cancer prior to that. So there were heirs that were not direct descendants, not children that were out there that did testify in this proceeding, but no, none of these things came to life until after Martha passed away. Did those heirs live in Cumberland County? Yes. And at the time he prepared this will for giving this loan to the judge, isn't that right, and his family? And his family. He was appearing before the judge regularly. That's correct. In this case, though, as far as the appearances before Judge Kochenauer, the hearing board found that Mr. Cutright, and this isn't very obvious, used the term simply oblivious, that he didn't think about the tax returns. He did not think about the work that he did while he was appearing in front of the judge. The record doesn't show that any special favors were ever given to Mr. Cutright. In fact, Mr. Cutright said he had lost some very hard decisions, he thought, before Judge Kochenauer over the years. In this case, the testimony shows that the way this developed as far as preparing the tax returns was that Mr. Cutright represented Clark Kochenauer's estate, the Kochenauers were involved in several business enterprises, Bob Dorr, the accountant for the family who was wholly independent of Mr. Cutright had always prepared the tax returns and continued to prepare those tax returns, but got uncomfortable about signing them because he didn't believe that he could have been very successful in representing people before the IRS. Mr. Cutright stated that he agreed initially to just review those business tax returns because he believed his client, the estate of Clark Kochenauer, had an interest in those and he thought it was appropriate. The testimony was that Judge Kochenauer would pick up the tax returns that were prepared by the client and would then deliver them to Mr. Cutright's office. Mr. Cutright originally denied that he had done the tax returns because he had no recollection of doing Judge Kochenauer's personal tax returns. In fact, one of the tax returns has his secretary's signature on it and she was authorized, he had trained his staff to go over these tax returns to check the figures to make sure everything was in line and in the appropriate place, but his office didn't have any of the background information. So this wasn't a case where the judge came directly to Mr. Cutright, said, John, I want you to do my tax returns. In effect, they got slipped in the pile with these business tax returns. After this came to light, my client does agree that it was inappropriate for him to be doing that. The hearing board and the review board confirming that, though, said in this case, based upon those circumstances, the evidence doesn't show that there was any intent in this instance to mislead anybody in the Circuit Court of Cumberland County by not disclosing this attorney-client relationship because, as a matter of fact, they said it never came to my client's mind, never came to his attention. He wasn't using it as a benefit. He wasn't trying to personally profit from it. In this case, the most interesting issue is obviously this 8.4A4 question about whether the court should split fraud, dishonesty, deceit or misrepresentation into four separate causes of action with different levels of proof that are involved. It's Respondent's position that if you look at the law in the state of Illinois, that we've always required some element of scienter or intentional behavior in order to prove up fraud, dishonesty, deceit or misrepresentation. In fact, in the terminology section of the present rules, it says fraudulent or conduct involving fraud or fraudulent conduct has to involve some type of an intent. In this case, the administrator has relied on this shorter decision from the D.C. court. If you read that decision, I would suggest that it just shows you how complicated the analysis is going to become if we take out scienter from a violation of 8.4A4. In the 19 years since that shorter decision has been issued by the D.C. court, it has not been picked up by any other jurisdiction in the land. The administrator here, in effect, is saying we need to follow that decision and for many reasons, legal, don't think that the court ever intended for its rule not to involve some type of scienter. To practical, you would have these charges that would have different standards of proof, different defenses, different levels of what the administrator would have to prove as far as the respondent's mental state was concerned. Therefore, we believe it would be a mistake and would make these proceedings much more complicated if the rule was changed as suggested by the administrator. Do you believe the rule encompasses constructive fraud? Good examples are the cases. And I would say that they do, though. As the one case cited by the administrator, that was the Jones decision where the attorney didn't disclose $500,000 worth of judgment, a judgment that had been entered against her in two loan applications based on what she thought was a good legal argument, which turned out not to be true. It wasn't a good legal argument. And what the court said is in that instance, she had to know that that information was relevant to the people that she failed to disclose it to and that she made a conscious choice not to disclose that information. Therefore, I think you could have constructive fraud be a violation under the rule if there is some indication that the attorney has made a conscious choice not to do something in a situation where it's obvious that there is a problem. And I think it's important that in a case like that, that a person like that be subjected to discipline, because that's the kind of person that we want to avoid having in the practice of law. Somebody who makes a conscious, purposeful decision is obviously somebody that the public needs to be protected from. In this case... How about somebody who treats this legal practice with a sense of oblivion? Does that person deserve any sanction? Again, I don't think that's as dangerous a person to the profession as somebody who will intentionally misrepresent facts to a court. I would just note this, it makes little difference to the victim, whether it's oblivious or intentional. That's probably true, though in this case we had a public member that sat on the hearing panel in this case. They read the facts and the hearing panel found, or not read the facts, saw the facts, saw all the testimony, and in that instance removed from a client intentionally, fraudulently. That's a person that needs to be removed from the practice. In this case, there was a recommendation that Mr. Cutright attend an ethics class, which he did, and has proven up. There is no, I mean, there's three problems here, but that's over a course of a 42-year career. And in this case, I think there are a lot of things that Mr. Cutright did that he did not want to be removed from the practice. And I think that's the reason why we have this community, and therefore we don't believe he should be removed for two years. Thank you. A few points in rebuttal, Your Honors. The administrator is not advocating that the concept of scienter be removed from the practice. The administrator believes that it would be easier and more forthright to look at the terms in Rule 8.484 and give them different but connected meanings, so that rather than lumping things under four, it would be  more forthright to say that this type of conduct is dishonest. And this type of conduct is a misrepresentation, rather than kind of pushing them all into the arena of fraud. And fraud does require scienter, but under the shorter opinion, these logical kinds of definitions, dishonest conduct would not require an intent to deceive, but would just be conduct that an attorney who did something dishonest without an intent to deceive would logically receive a lesser sanction for that dishonesty than would an attorney who engaged in fraud with an intent to deceive and with an intent to benefit himself. With regard to the sanction in this case, the administrator agrees that 2E is on point, to a point. 2E is a good starting point for the conflict of interest in this case, but as I believe this Court pointed out in some of its questions to Mr. Moran, this was an egregious conflict of interest. This was a large part of Martha Hayden's estate that was owed to her by the Kauknor family, who at least seemingly had an ability to repay that loan, and instead that money was then removed from her possession without any sort of incentive to do this. And the evidence at hearing was clear that at the time that Respondent created this document in February of 1993, Judge Kauknor had already looted part of her estate, and it seems that if Mr. Cutright would have done a little bit of digging or questioning her, he might have been able to discern that this was happening. Our problem with 2E is that it doesn't really cover the conduct in this case beyond the conflict of interest. It doesn't touch on the gifts to Judge Kauknor or the dishonesty inherent in his failure to talk about that relationship. It doesn't cover the neglect. So the six months that was given to Mr. 2E is a starting point for the sanction in this case, but we believe given the totality of the misconduct and also the aggravation, and the hearing board in this case was concerned that Respondent did not show any remorse for any of his misconduct. He thought that he represented Martha Hayden just fine. He kept repeating that he did what she wanted him to do, and he didn't see what the problem was. He said in connection with his neglect of the Bessie Carpenter estate, that he did what the heirs wanted him to do, and he didn't see what the problem was with not closing this estate for 16 years. So that's something that figures into the sanction decision here, and we believe that the more appropriate sanction is a two-year suspension. Thank you. Thank you.